Filed 12/20/13  P. v. Jones CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY CLAYTON JONES,<br><br>     Defendant and Appellant. | A138892<br><br>(San Francisco County<br>Super. Ct. No. 219684) |

## I. INTRODUCTION

This is an appeal from a trial court order authorizing the involuntary treatment of appellant with antipsychotic medications pursuant to Penal Code section 1370, subdivision (a)(2)(B)(ii)(I).[1]  Appellant contends that the trial court erred in authorizing such medication, because its use was not supported by substantial evidence and, therefore, in violation of his constitutional rights.  We disagree and affirm the trial court's order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On August 19, 2010, appellant went into a Walgreens store in San Francisco.  The manager recognized appellant from prior encounters, and told him he should not be in the store.  Appellant pulled out a knife and lunged at the manager, slicing his arm with the knife.  Appellant then filled a backpack with store merchandise and left.  He was arrested outside the store.

---

[1] All further statutory references are to the Penal Code.

On August 23, 2010, the district attorney filed a complaint charging appellant with one felony count of second degree robbery under section 211 and one count of assault with a deadly weapon under section 245, subdivision (a)(1).

At a court hearing on September 3, 2010, defense counsel "expressed doubt as to defendant's competency" and, as a result, "[c]riminal proceedings were ordered suspended and shall remain suspended." Pursuant to section 1369, the court appointed Dr. Mary Ann Kim to evaluate appellant. She did so and concluded, based on her meeting with him and a review of his medical records, that he was not competent to stand trial. Specifically, she diagnosed appellant as suffering from a "schizoaffective disorder" with "mild paranoid ideation." In a September 24, 2010, letter to the court, she opined that appellant's mental condition rendered him "unable to understand the nature of the criminal proceedings" pending against him, and also unable to "make a decision about what is medically appropriate for himself." Dr. Kim also noted that appellant had a long history of mental health problems, and had not been taking the medications necessary to address those problems.

Based on Dr. Kim's report, on October 4, 2010, the court found appellant not competent to stand trial on the charges against him, and ordered him committed to Napa State Hospital.

After approximately 16 months of treatment at Napa State Hospital—which included administration of antipsychotic medication—the court found, in an order dated March 5, 2012, that appellant's mental competency had been restored, and it reinstated the criminal proceedings against him.

On March 1, 2013,[2] at the conclusion of the preliminary hearing, the court ordered appellant held to respond to both charges in the complaint.

However, on March 6, the trial court again declared doubt about appellant's competency and appointed two other experts to evaluate him pursuant to sections

---

[2] All further dates noted are in 2013.

1368/1369. Those two experts were Dr. Paul Good, a clinical psychologist, and Dr. Anna Glezer, a psychiatrist.

On March 12, the district attorney filed a two-count information charging appellant with the same two charges that were in the complaint. However, the information also alleged the use of a deadly weapon in the commission of the robbery. (§ 12022, subd. (b)(1).)

The following month, Dr. Good filed his report with the court. He noted that he was only able to meet with appellant for 10 minutes before appellant terminated their meeting. Based on his review of appellant's medical records, Dr. Good observed that appellant had an extremely long and difficult psychiatric history, including 13 separate hospitalizations between August 2004 and June 2010, plus several other commitments since that time. With regard to those commitments, Dr. Good noted that appellant often refuses to take medications and had been taken to San Francisco General Hospital on February 19, after he had been found cutting his legs with a razor blade, "yelling uncontrollably, angry, and delusional."

On April 3, the trial court ordered (1) appellant to "cooperate with the doctors" and (2) Dr. Good to prepare a supplemental report. Dr. Good's subsequent report noted that he was unable to provide much additional substantive response because appellant refused to meet with him, instead lying on the floor with a "blanket over his head." Based on his interactions with appellant and his review of appellant's psychiatric history, Dr. Good concluded that appellant "is probably not competent at the present time" but was "likely to benefit from anti-psychotic medications."

On April 16, Dr. Glezer filed a report with the court. Like Dr. Good she concluded that appellant was not competent to stand trial. She did so based on an interview with him, a review of his psychiatric files and relevant police reports, the complaint, and Dr. Kim's September 2010 report to the court. Dr. Glezer's report addressed nine separate issues. Among other things, she opined that (1) appellant met the criteria for both "Schizoaffective Disorder" and "Cognitive Disorder Not Otherwise Specified," and (2) appellant would not be able to understand the nature of the criminal

3

proceedings or rationally assist counsel in his defense. She concluded that he was "currently not competent to stand trial," but that anti-psychotic medications were both an "appropriate treatment" for him and likely to restore him to "mental competence" as well as "effective for treating the symptoms that are currently experienced by [appellant]." Dr. Glezer also opined that appellant did not have "the capacity to make decisions regarding antipsychotic medication," and was currently a "danger to himself or others."

With regard to appellant being a danger to himself or others, Dr. Glezer stated "[a]t the time of this assessment, it is my opinion that [appellant] is at risk of harming himself or others. His risk factors include active mental illness, a history of impulsive behavior, and a history of substance use. The records available note multiple prior instances of violence, which puts him at risk of harming others, and that he has a history of self-injurious behaviors, which places him at higher risk of harming himself."

On April 22, the trial court found appellant not competent to stand trial and lacking in the capacity to make decisions regarding the administration of medication. It then appointed the Golden Gate Conditional Release Program (CONREP) to recommend a referral. On May 17, CONREP recommended that appellant be committed to Napa State Hospital under section 1370. On May 20, the court committed appellant to Napa State Hospital. It also ordered, pursuant to section 1370, subdivision (a)(2)(B)(ii)(I),[3] that the "treatment facility may involuntarily administer antipsychotic medication to the defendant when and as prescribed by the defendant's treating psychiatrist."

On June 4, appellant filed a timely notice of appeal from the commitment and involuntary medication order.

### III. DISCUSSION

The parties agree that our standard of review in this matter is whether substantial evidence supports the trial court's order authorizing his involuntary medication. And, indeed, this court has so held (see *People v. McDuffie* (2006) 144 Cal.App.4th 880, 887),

---

[3] The Attorney General initially miscites this section as "Section 1370, subdivision (a)(2)(ii)(I) in her brief to us, but later correctly cites it.

as have several of our sister courts. (See *People v. O'Dell* (2005) 126 Cal.App.4th 562, 570 (*O'Dell*); *People v. Christiana* (2010) 190 Cal.App.4th 1040, 1049-1050 (*Christiana*); *People v. Coleman* (2012) 208 Cal.App.4th 627, 633 (*Coleman*)[4]). Accordingly we look for, as our Supreme Court has held, " ' "evidence which is reasonable, credible, and of solid value . . . ." ' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1251, quoting from *People v. Hillhouse* (2002) 27 Cal.4th 469, 496.)

Justice Pollak, writing for a unanimous court in *Coleman*, summarized the legal principles underlying involuntary medical treatment authorized—albeit under limited circumstances—by section 1370. He stated: " 'The United States Supreme Court has held that "an individual has a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.' [Citation.]" [Citation.] To override that interest for the purpose of restoring a criminal defendant to competency to stand trial, due process requires the trial court to determine four factors: "First, a court must find that important governmental interests are at stake." [Citation.] "Second, the court must conclude that involuntary medication will significantly further those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense. . . . [Citation.]" [Citation.] "Third, the court must conclude that involuntary medication is necessary to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. . . ." [Citation.] "Fourth, . . . the court must conclude that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." ' " (*Coleman, supra,* 208 Cal.App.4th at p. 632, citing *Christiana,*

---

[4] Surprisingly, neither of the parties to this appeal have cited *Coleman*, the most recent appellate decision on this issue, and one by another Division of this court.

*supra,* 190 Cal.App.4th at p. 1049, and *Sell v. United States* (2003) 539 U.S. 166, 178, 180–181 (*Sell*).)

The *Coleman* court further explained that "[s]ection 1370, which authorizes involuntary treatment in California, 'essentially tracks the *Sell* factors. (§ 1370, subd. (a)(2)(B)(i)(III); [citation].) Under section 1370, . . . the trial court may authorize "the treatment facility to involuntarily administer antipsychotic medication to the defendant when and as prescribed by the defendant's treating psychiatrist," if the court determines that "[t]he people have charged the defendant with a serious crime against the person or property; involuntary administration of antipsychotic medication is substantially likely to render the defendant competent to stand trial; the medication is unlikely to have side effects that interfere with the defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner; less intrusive treatments are unlikely to have substantially the same results; and antipsychotic medication is in the patient's best medical interest in light of his or her medical condition." (§ 1370, subd. (a)(2)(B)(ii), (a)(2)(B)(i)(III).)' " (*Coleman, supra,* 208 Cal.App.4th at p. 633, citing *Christiana, supra*, 190 Cal.App.4th at pp. 1049-1050).)

The *O'Dell* and *Christiana* courts also agreed that there are four "*Sell* factors" which must be met to validate an involuntary administration of antipsychotic drugs. (See *O'Dell, supra,* 126 Cal.App.4th at pp. 570-572 and *Christiana, supra,* 190 Cal.App.4th at pp. 1050-1052.) Although only one of them is at issue here, we will summarize all four as described by the *Christiana* court. It stated that (1) the "first *Sell* factor involves an inquiry into whether the charged offense is a serious crime against person or property in light of the individual case" (*Christiana, supra,* 190 Cal.App.4th at p. 1050); (2) the "second *Sell* factor requires the prosecution to produce substantial evidence that involuntarily medicating the defendant would significantly further the state interests of timely prosecution and a fair trial, which in turn requires showings that such medication is both substantially likely to render the defendant competent to stand trial and substantially unlikely to have side effects that would interfere significantly with the defendants ability to assist counsel in conducting the defense" (*ibid.*); (3) the "third *Sell*

6

factor requires a showing that involuntary medication is necessary to further the state's interests in timely prosecution and a fair trial" (*id.* at p. 1051); (4) and that the "fourth *Sell* factor requires a showing of medical appropriateness." (*Id.* at p. 1052.)

Citing section 1370, subdivision (a)(2)(B)(ii)(I), appellant's argument is based on the fourth factor articulated in *Sell* and reiterated in *Christiana.* He argues that the trial court's order is "not supported by substantial evidence that, 'if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the patient will result.' "

The subsection of section 1370, subdivision (a)(2) relied on by appellant provides: "(B) The court shall hear and determine whether the defendant, with the advice of his or her counsel, consents to the administration of antipsychotic medication, and shall proceed as follows: . . . [¶] (ii) If the defendant does not consent to the administration of medication, the court shall hear and determine whether any of the following is true: [¶] (I) The defendant lacks capacity to make decisions regarding antipsychotic medication, the defendant's mental disorder requires medical treatment with antipsychotic medication, and, *if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the patient will result. Probability of serious harm to the physical or mental health of the defendant requires evidence that the defendant is presently suffering adverse effects to his or her physical or mental health, or the defendant has previously suffered these effects as a result of a mental disorder and his or her condition is substantially deteriorating.* The fact that a defendant has a diagnosis of a mental disorder does not alone establish probability of serious harm to the physical or mental health of the defendant." (Italics added.)

As noted, appellant's sole contention on appeal is that Dr. Glezer's report does not provide "substantial evidence of probable serious harm to appellant's physical or mental health without antipsychotic medication." We disagree. Dr. Glezer's thorough report and recommendations were based on her interview of appellant as well as her review of extensive records concerning his conduct and behavior. Ten such records were reviewed

7

by Dr. Glezer, including several months of "San Francisco Jail Psychiatric Services Notes," eight "San Francisco Police Department Incident Report[s]," a "[c]hronological report of investigation," three court reports submitted by the Napa State Hospital, and Dr. Kim's 2010 report.

Based on both her interview with appellant and her review of these documents, Dr. Glezer made several specific findings which, we conclude, constitute substantial evidence that, without medication, appellant and/or others could well suffer additional physical and mental harm. Thus, she first noted that the records she examined showed that appellant "has previously been treated with antipsychotic medication and that this helped to improve his mental state." In the next paragraph of her letter to the court, Dr. Glezer responded to the question of whether "antipsychotic medication [is] likely to restore this defendant to mental competence?" by stating: "It is my opinion that it is likely that with medication, Mr. Jones' symptoms will improve, leading to improvements in his thought process and behavior, and therefore, mental competence." On the next page of her letter to the court, Dr. Glezer responded to this specific question: "What are the likely effects of the medication, expected efficacy of the medication, and possible alternative treatments?" The relevant—for present purposes—portion of her response was: "By adjusting the dose and type of medication utilized, most individuals with psychosis and mania experience significant improvement of their symptoms. [¶] With respect to side effects, available antipsychotic medications vary significantly. However, all of the medications share a low risk of muscle stiffness, restlessness, fever, delirium, or (with long term use) irreversible abnormal involuntary movements. Other possible side effects include weight gain and elevated risks of diabetes, high cholesterol, and high triglycerides. It is impossible to predict the exact effects of a medication in advance, but the prescribing physician would be able to work with Mr. Jones to optimize the medication and dose in order to minimize side effects and maximize benefits."

In addition, in explaining her affirmative answer to the court's question of whether appellant was "a danger to himself or others," Dr. Glezer responded that "[a]t the time of this assessment, it is my opinion that Mr. Jones is at risk of harming himself or others.

8

His risk factors include active mental illness, a history of impulsive behavior, and a history of substance use. The records available note multiple prior instances of violence, which puts him at a higher risk of harming others, *and that he has a history of self-injurious behaviors, which places him at a higher risk of harming himself.*" (Italics added.)

Therefore, we have no difficulty in concluding that the court did not err in ordering that pursuant to section 1370, the "treatment facility may involuntarily administer antipsychotic medication to the defendant when and as prescribed by the defendant's treating psychiatrist."

Appellant, however, argues that the evidence before the court did not constitute substantial evidence that "it is probable that serious harm to the physical or mental health of the patient will result." (§ 1370, subd. (a)(2)(B)(ii)(I).) Stressing the fact that the reports do not employ the word "probable," appellant argues that they merely suggest that serious harm is "possible." He is incorrect. Although Dr. Glezer did not specifically use the term "probable" in her opinion letter to the court, she makes essentially this same point. Her statement that appellant "has a history of self-injurious behaviors, which places him at a higher risk of harming himself" demonstrates that in her opinion, it was far more than a possibility—indeed a probability—that appellant was likely to harm himself or others absent the administration of an antipsychotic drug.

Moreover, Dr. Glezer's observations and conclusions rebut appellant's argument that "[h]er report failed to address whether and how treatment with antipsychotic medication would impact appellant's risk of harm to himself or others." We believe they clearly do. Dr. Glezer stated that with the proper medication, "most individuals with psychosis and mania experience significant improvement of their symptoms." Given that appellant's symptoms include a heightened, and therefore, probable risk of harm to self and others, the treatment of his symptoms would certainly address this probability. Further, in his earlier and briefer response, Dr. Good described appellant's self-harming

9

behavior and his refusal to take medication[5], which supplies further evidence of the efficacy of involuntary treatment.  Thus, Dr. Good stated, "Mr. Jones has a long psychiatric history involving diagnoses of major mental illness, including Schizoaffective disorder, Bipolar disorder, and Psychosis NOS.  He has been hospitalized multiple times all over the state.  He often refuses to take medications.  He has spent over a year at Napa state hospital for competency restoration in late 2010-2012."  Dr. Good also noted that, in February of 2013, appellant "was found cutting himself on his legs with a razor blade, and placed in a safety cell, yelling uncontrollably, angry, delusional and was 5150'd to SF General Hospital."  In sum, the observations and concerns of Drs. Good and Glezer were directed at the issue posed by section 1370, subdivision (a)(2)(B)(ii)(I)—and the *only* issue raised by appellant here—i.e., that "if the defendant's mental disorder is not treated with anti-psychotic medication, it is probable that serious harm to the physical or mental health of the patient will result."  (*Ibid.*)

Given that substantial evidence supported its order, we find no error.

## IV. DISPOSITION

The order appealed from is affirmed.

---

[5] The record also contained evidence, in the form of Dr. Kim's 2010 report, that appellant had a long history of mental health problems, as well as a failure to take the medications necessary to address those problems.

_____

Haerle, J.

We concur:

_____
Kline, P.J.

_____
Brick, J.*

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11