[No. A133226. First Dist., Div. Three. Aug. 1, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
MALCOLM PAUL COLEMAN, Defendant and Appellant.

**COUNSEL**

Jeremy Price, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Laurence K. Sullivan and Seth K. Schalit, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**POLLAK, J.**—Defendant appeals from an order authorizing his involuntary medication for purposes of restoring him to competency to stand trial. He contends that insufficient evidence supports the order and that the order is fatally nonspecific insofar as it fails to identify the specific medications he may be given, as well as the dosage and duration of any treatment. We shall affirm.

## Factual and Procedural Background

On February 24, 2009, defendant was charged with attempted forcible rape (Pen. Code,[1] §§ 261, subd. (a)(2), 664), attempted forcible oral copulation (§§ 288a, subd. (c), 664), and indecent exposure (§ 314, subd. 1). The complaint also alleged defendant had served a prior prison term (§ 667.5, subd. (b)). An information was subsequently filed charging defendant with the crimes and enhancement alleged in the complaint and adding a fourth count for making criminal threats (§ 422). The underlying conduct occurred while defendant was a patient at Napa State Hospital; the victim was a psychiatric technician assistant at the hospital.

On April 7, 2009, defendant was found incompetent to stand trial. In conjunction with the new commitment to Napa State Hospital, the court authorized involuntary administration of antipsychotic medication to restore him to competency. On November 24, 2010, the court found defendant had been restored to competence.

At the request of defendant's counsel, the court ordered that defendant continue to be housed at the state hospital. As defense counsel explained, "[I]t appears to me that Mr. Coleman's competence is fragile, and very dependent upon the regimen of medications he's been receiving carefully by Napa State Hospital, and . . . I believe if housed in the jail, that that medication is not likely to be continued in the same fashion, and I am very concerned about the competence of Mr. Coleman if he is to be housed in the jail."

By letter dated July 25, 2011 (July letter), the hospital requested authorization to involuntarily medicate defendant as a person competent to stand trial but in need of continuing treatment. The letter explains, "During his current hospitalization, Mr. Coleman was medicated with Chlorpromazine (antipsychotic), Haloperidol (antipsychotic) and Topiramate (mood stabilizer). The medications resulted in significant stabilization of Mr. Coleman's symptoms and restored him to competent to stand trial. [¶] Mr. Coleman has begun to refuse all psychotropic medications. . . . [¶] Since refusing psychotropic medications, Mr. Coleman's symptoms of mental illness have significantly worsened. . . . Increasingly, he is becoming paranoid and distrustful of his lawyer and the legal system. . . . In summary, the stability that existed at the time Mr. Coleman was taking medications is quickly deteriorating away." The "Treatment Plan and Rationale" included in the July letter states: "Psychotropic medications . . . are the mainstay of treating psychotic mental illness. While previously treated with these medications Mr. Coleman experienced

---

[1] All statutory references are to the Penal Code unless otherwise noted.

resolution and/or control of many symptoms of his mental illness. Furthermore, these medications stabilized Mr. Coleman's symptoms to a degree that his treatment team felt he was competent to stand trial. This competency will be lost or put in question if the disease process (i.e. schizophrenia) is left untreated (i.e. without medications)."

On August 5, 2011, defense counsel again declared a doubt as to defendant's competency. On August 8, counsel reiterated his concerns regarding defendant's competency and the court suspended proceedings and appointed psychologist Richard Geisler to evaluate defendant. In his report, Dr. Geisler concluded that defendant was not competent. Dr. Geisler explained, "Unfortunately, the symptoms of Mr. Coleman's schizophrenia have become much more acute since the examiner's previous evaluation of him in November 2010. The exacerbation of his symptoms is the likely result of his refusal to take the antipsychotic medications that have been prescribed for him. He now has developed delusions that have become an integral part of the way he perceives and thinks about his legal defense. His unwavering insistence on using non-existent evidence to prove his innocence has interfered with his comprehension of the proceedings against him and with the conduct of a rational defense with his attorney. That is, he appears so convinced of the irrefutability and unambiguousness of nonexistent evidence that he is absolutely certain that he would be exonerated in a trial. Accordingly, he will not entertain a [not guilty by reason of insanity] plea because of his conviction that he will be exonerated as a direct result of evidence that does not exist." Earlier in the report, Dr. Geisler explains that when he interviewed defendant he "was able to give a reasonable account of the alleged offense itself, but he drifted into delusional material when talking about the secret system of surveillance electronics installed on the hospital unit where the instant offense occurred. These delusions about a (non-existent) surveillance system appear to be interfering with his trial competency in a major way." (Fn. omitted.)

On September 12, 2011, after the parties waived a jury trial and submitted the question of competence on the report of Dr. Geisler, the court found defendant incompetent to stand trial. After making that finding, the court considered the issue of involuntary medication. Dr. Ripudanan Brar, defendant's treating psychiatrist at Napa State Hospital and the co-author of the July 2011 letter, testified that defendant suffers from schizophrenia undifferentiated type. He explained that for several months, defendant had been receiving chlorpromazine and haloperidol, both of which are antipsychotics, and topiramate, which is a mood stabilizer. For the two months before the hearing, however, defendant had refused to take his medication, causing him to "decompensate quickly." He explained, "Symptoms of his mental illness [have] returned or exaggerated in particular delusions," including "delusions regarding cameras and surveillance equipment located in his previous unit." The doctor opined that if defendant "were to take psychotropic medications

there's a significant chance that his symptoms will remit and he will once more become competent." Dr. Brar testified about the various side effects of the prescribed medications,[2] and explained that while defendant was on these medications previously, "he did not appear to have any significant cognitive effects because of these medications" nor did Dr. Brar observe defendant with "droopy eyes effect or falling asleep" while taking the medication. Dr. Brar also testified that "[f]or severe schizophrenia the standard of treatment is medications" and that in his opinion, there was no less intrusive treatment. Dr. Brar believed that the administration of antipsychotic medications was in defendant's best interest in light of his condition.

Following the hearing, the court issued an order authorizing the Napa State Hospital "to involuntarily administer antipsychotic medications to the defendant as prescribed by his treating psychiatrist." Defendant timely filed a notice of appeal.

## Discussion

■ "The United States Supreme Court has held that 'an individual has a "significant" constitutionally protected "liberty interest" in "avoiding the unwanted administration of antipsychotic drugs." [Citation.]' [Citation.] To override that interest for the purpose of restoring a criminal defendant to competency to stand trial, due process requires the trial court to determine four factors: 'First, a court must find that important governmental interests are at stake.' [Citation.] 'Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense . . . . [Citation.]' [Citation.] 'Third, the court must conclude that involuntary medication is necessary to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. . . .' [Citation.] 'Fourth, . . . the court must conclude that administration of the drugs is medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition.' "

---

[2] Dr. Brar testified that "Thorazine and Haldol can cause [a] variety of different side effects ranging from sedation to drowsiness. They can, there [are] cardiac effects which range from palpitations to sudden death. There are possible, there are some studies that [find] Thorazine may cause cataracts in Beagle dogs. They can also cause weight gain, metabolic syndrome, hypercholestremia. They can cause constipation as well. There [is a] prudentially failed [*sic*] side effect which is neurological malignant syndrome which is potentially life threatening. Patient presents with fever, breakdown of muscle tissue that can cause kidney failure." Defendant apparently was receiving generic versions of thorazine and haldol which presumably have the same side effects.

(*People v. Christiana* (2010) 190 Cal.App.4th 1040, 1049 [119 Cal.Rptr.3d 191] (*Christiana*), fn. omitted, some italics omitted, quoting *Sell v. United States* (2003) 539 U.S. 166, 178, 180–181 [156 L.Ed.2d 197, 123 S.Ct. 2174] (*Sell*).)

 Section 1370, which authorizes involuntary treatment in California, "essentially tracks the *Sell* factors. (§ 1370, subd. (a)(2)(B[(i)(III))]; [citation].) Under section 1370, . . . the trial court may authorize 'the treatment facility to involuntarily administer antipsychotic medication to the defendant when and as prescribed by the defendant's treating psychiatrist,' if the court determines that '[t]he people have charged the defendant with a serious crime against the person or property; involuntary administration of antipsychotic medication is substantially likely to render the defendant competent to stand trial; the medication is unlikely to have side effects that interfere with the defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner; less intrusive treatments are unlikely to have substantially the same results; and antipsychotic medication is in the patient's best medical interest in light of his or her medical condition.' (§ 1370, subd. (a)(2)(B)[(ii), (i)(III)].)" (*Christiana, supra*, 190 Cal.App.4th at pp. 1049–1050.) We review an order authorizing involuntary treatment under section 1370 for substantial evidence. (*Christiana*, at pp. 1049–1050.)

In this case, defendant acknowledges that substantial evidence supports "some of the elements necessary to justify an involuntary medication order on competency grounds," but contends the record lacks substantial evidence that the involuntary administration of antipsychotic medication was substantially likely to render him competent to stand trial or that administering antipsychotic medications was medically appropriate in light of his medical condition.

1. *Substantial evidence supports the finding that the administration of antipsychotic medication is substantially likely to render defendant competent to stand trial.*

The second *Sell* factor, as incorporated in section 1370, subdivision (a)(2)(B)(i)(III), requires the court to find that "involuntary administration of antipsychotic medication is *substantially likely* to render the defendant competent to stand trial . . . ." (Italics added.) Defendant argues, as he did in the trial court, that Dr. Brar's testimony that there is a "significant chance" that medication will restore defendant to competency is not the equivalent of evidence that there is a "substantial likelihood" that medication will restore

defendant's competency, as required by both *Sell* and section 1370. Defendant also faults the prosecution for failing to establish a "nexus between [defendant's] competence and his medication." He argues that "Dr. Brar's testimony should have been directed at the bases for Dr. Geisler's opinion (and the court's determination) that [he] was not competent to stand trial," including "whether [defendant], with the benefit of antipsychotic medication, would be able to recall the specific charges against him or rationally weigh the pros and cons of an insanity defense or the significance of his prior strike convictions on plea negotiations."

■ Contrary to defendant's arguments, Dr. Brar's testimony when considered in the context of the full evidentiary record, amply supports the court's finding that there is a substantial likelihood that medication will restore defendant's competence to stand trial.[3] The record establishes a sufficient nexus between the antipsychotic medications and the specific barriers to competence identified by Dr. Geisler. As set forth above, Dr. Geisler concluded that defendant's delusional beliefs that nonexistent surveillance video would exonerate him of all criminal charges was interfering with his competence to stand trial. The July letter requesting authorization for involuntary medication explains that defendant's paranoid delusions have "significantly worsened" since he began refusing medication and were increasingly interfering with his legal representation. In his live testimony, Dr. Brar reiterated that since stopping his medication, defendant's paranoia and delusions, including those regarding the surveillance cameras, had returned or been exaggerated. Dr. Brar's July letter states that when defendant was treated previously with antipsychotic medications he "experienced resolution and/or control of many symptoms of his mental illness" and that the medication stabilized his "symptoms to a degree that his treatment team felt he was competent to stand trial." The above evidence supports the conclusion that the medications were intended to remedy or at least control the specific symptoms (i.e., the delusions) that were interfering with defendant's competence.

The record establishes further that there is a substantial likelihood that defendant's competence will be restored with medication. Defendant makes much of Dr. Brar's testimony that he believed there was only a "significant chance" that medication would restore defendant's competence. But as the trial court noted, although "it might be helpful to ask him . . . if there was substantial likelihood," there was no meaningful difference between the terms in this case. Indeed, the July letter, which Dr. Brar signed as defendant's treating psychiatrist/physician, states that it is the "medical opinion of the

---

[3] Despite his focus on Dr. Brar's testimony, defendant acknowledges that a substantial evidence review requires this court to consider the evidence as a whole in the light most favorable to the judgment and that the evidentiary record before the court includes the July letter from Napa State Hospital and Dr. Geisler's competency evaluation.

treating physician that the administration of medication is substantially likely to render the patient and/or maintain the patient as competent to stand trial." Perhaps the most persuasive evidence of the likelihood that medication will restore defendant's competence is defendant's own medical history. Medication successfully restored defendant's competence previously and he moved from competency to incompetency only after he stopped taking his medication. Nothing in the record suggests that medication would not be similarly effective again.

2. *Substantial evidence supports the finding that the administration of antipsychotic medication is medically appropriate in this case.*

■ The fourth *Sell* factor as incorporated in section 1370, subdivision (a)(2)(B)(i)(III), requires the court to find that "antipsychotic medication is in the patient's best medical interest in light of his or her medical condition." Evaluation of this factor requires the trial court " 'to consider specific drugs, their unique side effects, and their medical appropriateness. Specificity as to the medications to be administered is critical.' " (*Carter v. Superior Court* (2006) 141 Cal.App.4th 992, 1004 [46 Cal.Rptr.3d 507]; see *People v. O'Dell* (2005) 126 Cal.App.4th 562, 572 [23 Cal.Rptr.3d 902] ["This fourth factor in *Sell* corresponds to the fifth factor in section 1370, subdivision [(a)(2)(B)(i)(III)]. 'The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success.' " (quoting *Sell, supra*, 539 U.S. at p. 181)].) Federal courts have adopted similar requirements regarding the evidentiary showing necessary to satisfy the fourth *Sell* factor. (See *U.S. v. Rivera-Guerrero* (9th Cir. 2005) 426 F.3d 1130, 1137, 1142 [the trial court must develop a record that gives " 'attention to the type of drugs proposed, their dosage, and the expected duration of a person's exposure' "]; *U.S. v. Evans* (4th Cir. 2005) 404 F.3d 227, 241–242 [in seeking an involuntary medication order the government must "set forth the particular medication and dose range of its proposed treatment plan . . . [and] must also relate the proposed treatment plan to the individual defendant's particular medical condition"].)

Here, the psychologists and psychiatrists have consistently diagnosed defendant with schizophrenia and uniformly agreed that medication would be medically appropriate for treatment of his mental illness. The specific antipsychotic drugs to be administered to defendant were identified in both the proposed treatment plan included in the July letter and at the hearing. The

proposed medications are the same medications previously administered to defendant and the prior dosage of those medications given defendant is contained in reports submitted by the Napa State Hospital.[4] Dr. Brar detailed the known potential side effects of these medications and testified that he had not observed defendant suffering from any severe side effects while previously on the medications.

This record stands in stark contrast to the record in the cases cited by defendant. In *Carter v. Superior Court, supra*, 141 Cal.App.4th at page 997, one psychiatrist identified defendant as suffering from schizophrenia and included in his report summary findings of each of the *Sell* factors. When pressed for further information, the doctor "answered 'maybe' to the following questions: (1) whether it would be medically appropriate to treat petitioner with medication, (2) whether medication would be effective, (3) whether the medication would make petitioner competent to stand trial, and (4) whether if left untreated petitioner would suffer serious harm to his physical or mental health." (*Id.* at p. 998.) A second doctor was less certain in his diagnosis and concluded that " '[in]voluntary administration of medication to restore competency would be reasonable if the diagnosis after psychological testing is one[] [w]hich responds to medication.' " (*Id.* at p. 997.) Neither doctor provided any evidence regarding the "actual medication petitioner should be given." (*Id.* at p. 1003.)

In *Christiana, supra*, 190 Cal.App.4th at pages 1048, 1051, the psychiatrists found it "difficult" to identify "defendant's specific medical condition" and "testified only about antipsychotic drugs as a class, without identifying what drugs would likely be used to treat defendant." The doctors "did not testify whether the generic antipsychotic medication he described would be equally effective regardless of what defendant was diagnosed with." (*Id.* at p. 1048.) The psychiatrists' "testimonies about potential side effects were similarly generic" (*id.* at p. 1051) and one psychiatrist testified that the defendant, unlike defendant in the present case, " 'hasn't been medicated yet, and his symptoms have gone on for a long period of time[,] [s]o he may be a little resistant to those medications initially' " (*id.* at p. 1048).

Finally, in *U.S. v. Evans, supra*, 404 F.3d at page 240, the court noted that the involuntary medication report "generally discusses the benefits of atypical antipsychotic medication over conventional antipsychotics, but it never actually states the particular type of atypical antipsychotic medication the [hospital] staff planned to administer to [defendant]." The report concludes that

---

[4] The section 1372 report submitted to the court in November 2010, which recommended defendant's return to court as competent, indicates that under the court's prior order authorizing involuntary medication defendant was being administered "Chlorpromazine HCL. 400 mg. tablet taken orally at 8:00 AM and 12:00 PM and 600 mg. tablet taken orally at 4:00 PM" and "Haloperidol 20 mg. tablet taken orally at 8:00 PM."

medication "is 'medically appropriate' because 'the standard treatment of anyone with [defendant's] condition of Schizophrenia would involve the prescription of antipsychotic medication' " (*id.* at p. 241) but "never addressed why it concluded that [defendant], an elderly man with diabetes, hypertension, and asthma who takes a number of medications to treat these conditions, would not experience side effects that would interfere with his ability to assist counsel" (*ibid.*).

### 3. *The trial court's order is not fatally deficient.*

Section 1370, subdivision (a)(2)(B)(ii) directs the court to "issue an order authorizing the treatment facility to involuntarily administer antipsychotic medication to the defendant *when and as prescribed by the defendant's treating psychiatrist.*" (Italics added.) Defendant does not dispute that the court's order complies with this statute. He argues, however, that *Sell, supra,* 539 U.S. 166 requires the court to include in its order "basic limitations as to the type of medication the defendant's treating physician may administer, the maximum dosage, and the duration of the authorization." Defendant relies on *U.S. v. Hernandez-Vasquez* (9th Cir. 2008) 513 F.3d 908, 916–917 in which the court held that an order authorizing involuntary medication for the purpose of restoring a defendant to competence "must provide at least some limitations on the medications that may be administered and the maximum dosages and duration of treatment. At a minimum, to pass muster under *Sell,* the district court's order must identify: (1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant's mental condition and progress." The court acknowledged that "*Sell* does not identify a requisite degree of specificity concerning the drugs to be used for involuntary medication," but reasoned that "*Sell*'s discussion of specificity would have little meaning if a district court were required to consider specific drugs at a *Sell* hearing but then could grant the Bureau of Prisons unfettered discretion in its medication of a defendant. While *Sell* appropriately does not direct district courts to micromanage the decisions of medical professionals, reading it as imposing no limits upon the discretion of the treating physicians would render judicial inquiry about specific drugs academic. A broad grant of discretion to medical professionals also risks distracting such professionals from *Sell*'s narrow purpose of restoring a defendant's competency for trial." (*Id.* at p. 916.) No California court has

adopted these additional requirements.[5] Nor have the requirements of *Hernandez-Vasquez* been strictly applied by other federal courts.

In *U.S. v. Green* (6th Cir. 2008) 532 F.3d 538, 556, the court recognized that the parameters set forth in *U.S. v. Hernandez-Vasquez, supra*, 513 F.3d at pages 916–917 are intended "to ensure the government meets its burden under the fourth *Sell* factor." The court concluded, however, that requiring strict adherence to the *Hernandez-Vasquez* requirements "would elevate form over substance in determining the appropriateness of the directive" (*Green*, p. 554) and therefore it was "not inclined to find a lack of specific directives fatal to the propriety of the *Sell* order here" (*Green*, p. 557). The court explained, "This is not a situation, such as that presented in *Evans*[, *supra*, 404 F.3d 227] or *Hernandez-Vasquez*, where the government failed to present sufficient evidence to meet its burden . . . . Rather, it is a situation where the district court simply chose not to incorporate all the evidence presented to it in its written order. Therefore, we assume, as did the district court, that [defendant] will be medicated in accordance with the proposed treatment plans of [his treating psychiatrist] as described at the hearing below. . . . [¶] . . . We require that the record is clear that physicians exercise their medical judgment and make decisions in accordance with prevailing medical standards, all while taking into account the particular needs and decisions of the individual patient. As noted, the detailed record before us shows a treatment plan with the specific medication or range of medications to be administered by the Bureau of Prisons, and under what circumstances each will be administered (e.g., voluntarily or forcibly), as well as the expected dosages and the expected time frame for achieving competence." (*Green*, pp. 557–558.)

We too conclude that strict adherence to the *Hernandez-Vasquez* requirements is not necessary to ensure the protection of the defendant's rights. As in *U.S. v. Green, supra*, 532 F.3d at pages 557–558, and as discussed above, substantial evidence supports the finding that the course of treatment detailed throughout the record is medically appropriate for defendant. The doses of medication previously administered to defendant are specified with particularity in the record. Implicit in the court's order is that the authorization of involuntary medication is to be consistent with defendant's well-documented

---

[5] Defendant suggests incorrectly that the court adopted these additional requirements in *Christiana, supra*, 190 Cal.App.4th at page 1052. In *Christiana*, the court merely included *Hernandez-Vasquez* in a string cite, following a citation to *U.S. v. Rivera-Guerrero, supra*, 426 F.3d at page 1142, in support of the proposition that the trial court must develop a record that gives "attention to the type of drugs proposed, their dosage, and the expected duration of a person's exposure." The court then concluded, "Just as in the above listed cases, the required specific showing was wholly lacking in this case. We therefore reverse the order authorizing involuntary administration of antipsychotic medication because it was not supported by sufficient evidence." (*Christiana*, at p. 1052.)

prior treatment plan. While it would be preferable to expressly state this limitation in the order, we believe that the record in this case leaves no room to doubt the scope of the order. The order cannot reasonably be understood to grant the hospital carte blanche to administer medication beyond what the record reveals to be defendant's treatment plan.

Finally, while it may be necessary in federal court to specify in the court's order "the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant's mental condition and progress," such specificity is unnecessary in California state courts because the statute requires periodic judicial review. The reporting requirement is governed by section 1370, subdivision (b)(1), which provides: "Within 90 days of a commitment made pursuant to subdivision (a), the medical director of the state hospital or other treatment facility to which the defendant is confined shall make a written report to the court . . . concerning the defendant's progress toward recovery of mental competence. . . . If the defendant has not recovered mental competence, but the report discloses a substantial likelihood that the defendant will regain mental competence in the foreseeable future, the defendant shall remain in the state hospital or other treatment facility or on outpatient status. Thereafter, at six-month intervals or until the defendant becomes mentally competent, where the defendant is confined in a treatment facility, the medical director of the hospital or person in charge of the facility shall report in writing to the court . . . regarding the defendant's progress toward recovery of mental competence. . . . If the report indicates that there is no substantial likelihood that the defendant will regain mental competence in the foreseeable future, the committing court shall order the defendant to be returned to the court for proceedings pursuant to paragraph (2) of subdivision (c)." (See § 1370, subd. (a)(2)(B)(vi) ["Any report made pursuant to paragraph (1) of subdivision (b) shall include a description of any antipsychotic medication administered to the defendant and its effects and side effects, including effects on the defendant's appearance or behavior that would affect the defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner. During the time the defendant is confined in a state hospital or other treatment facility or placed on outpatient status, either the defendant or the people may request that the court review any order made pursuant to this subdivision. The defendant, to the same extent enjoyed by other patients in the state hospital or other treatment facility, shall have the right to contact the patients' rights advocate regarding his or her rights under this section."].) These provisions undoubtedly provide sufficient judicial oversight and protection against unending ineffective involuntary medication.

## Disposition

The order is affirmed.

McGuiness, P. J., and Siggins, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 20, 2012, S205518.