Filed 2/23/15  P. v. J.N. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059888 |
| v. | (Super.Ct.No. RIF1302445) |
| J.R.N., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Irma Poole Asberry, Judge.  Reversed.

Laurel M. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Supervising Attorney General, Andrew Mestman and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant J.R.N. (defendant) appeals an order of the superior court granting authority to administer antipsychotic medications to him involuntarily. We reverse.

FACTS AND PROCEDURAL HISTORY

According to defendant, he had been released on parole about one week before the incident resulting in the current charge. He was staying at a relative's home, although apparently that residence had not been approved by defendant's parole officer. When a parole agent and a deputy sheriff went to the residence on March 12, 2013, some kind of disagreement or scuffle took place, after which defendant was arrested for a parole violation and charged with one count of resisting the officers (Pen. Code, § 69).

Early in the proceedings, the court declared a doubt as to defendant's competency to stand trial. The court suspended proceedings and appointed Drs. Craig Rath and Edward Pflaummer to evaluate defendant. Dr. Rath found defendant was able to cooperate with counsel, he was currently stabilized on medication, and he understood the proceedings against him. However, defendant's "continuing competency is predicated on his continuing to receive medication. He would quickly deteriorate if unmedicated or taking illicit substances of any kind. The defendant will require ongoing medication for the foreseeable future for his combination of disorders." Dr. Rath opined that defendant was competent to make decisions regarding medication. Dr. Pflaummer found that defendant suffered from a mental illness with psychotic elements. Defendant had "poor comprehension, confusion, scattered thinking and . . . mental illness," but that he was not

2

malingering during his psychological testing. Dr. Pflaummer found defendant incompetent to stand trial. Defendant needed antipsychotic medication, which would likely be effective for him.

After reviewing these conflicting reports, the court appointed a third evaluator, Dr. Jennifer Bosch, to assess defendant's competency.

Dr. Bosch reported that defendant was aware that he had mental illness, which was treated with medication, but he could not name the medications he was taking. Defendant did not appear to know the role of the judge, the prosecutor, or the defense attorney, "nor could he accurately report on what he is being charge[d] with." Defendant was "non-responsive when he was asked questions regarding general court proceedings, going off on totally unrelated tangents which had nothing to do with the questions asked. It is this examiner's opinion the defendant is not competent to proceed at this juncture as he is incapable of aiding in his defense, does not understand court proceedings nor does he understand the roles of any of the professionals involved in his case."

On receipt of the third report, the court ordered that the proceedings remain suspended, and referred defendant to the county mental health department for a recommendation for defendant's placement for treatment. The court later also ordered yet another report on the separate issue of defendant's capacity to decide whether or not to take antipsychotic medications. The doctor originally appointed to provide the medication evaluation was unavailable, so the court ultimately appointed Dr. Harvey Oshrin to examine defendant.

Dr. Oshrin prepared a report for the court, and testified at a hearing on the issue. Dr. Oshrin's written report concluded that defendant "lacks capacity to make decisions related to antipsychotic medication although he allowed that he is willing to take medication if it did not make him worse, only if it helps."

At the hearing, Dr. Oshrin testified that "Medically speaking," defendant did "lack capacity" to make decisions about whether to take antipsychotic medication. Dr. Oshrin based his opinion on defendant's evident mental confusion and disorganization. Defendant's "thought processes are not logical and rational . . . ." Defendant lacked a "deep understanding" of his condition, and of the benefits and risks of taking medications, although "superficially he says he is willing to take it if it helps him."

On cross-examination, Dr. Oshrin stated that it was possible, given Dr. Oshrin's diagnosis of drug-induced psychosis, that defendant might recover without any medical intervention if he refrained from taking illicit drugs. Defendant had a "history" of taking the medication that was prescribed for him, and he had expressed his willingness to take medications. Defense counsel asked, "And to that effect, . . . that he has made the decision to take meds in the past and he states he's willing to continue to take them, you believe that he has the capacity to make medication decisions?" Dr. Oshrin responded, "Yes. At the moment, yes." Dr. Oshrin also agreed that a person can have the capacity to make medication decisions without having a deep understanding of his or her mental illness.

4

On redirect examination, the prosecutor asked Dr. Oshrin to explain the apparent contradiction between his statement that defendant lacked the capacity to make medication decisions, and his statement that defendant had the capacity to do so "at the moment." Dr. Oshrin testified that defendant was "willing to go along with the program. He's willing to take medication if the professionals feel he needs it," but that defendant was "not able to form [the] opinion himself" that he needed or did not need medication. Defendant's mental disorder affected his ability to understand the need for antipsychotic medication; defendant did not have the capacity to understand his need for medication, and in that sense his cooperation was superficial only.

The trial court granted the prosecution's motion under Penal Code section 1370 for involuntary administration of antipsychotic medications to defendant.

Defendant has appealed, arguing that the evidence was insufficient to support the court's order.

## ANALYSIS

### I. We Decline to Dismiss for Mootness Where the Issue Is One of Great Public Interest, and Is Capable of Repetition Yet Evading Review

Preliminarily, we take up the People's motion to dismiss the appeal as moot. The People have presented a minute order of the trial court showing that defendant has, with treatment, been restored to competency to stand trial. The People argue that the involuntary medication order is therefore moot, as there is no effective relief that may be

5

afforded to defendant.**1** (See *Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541.) "A case is moot when the decision of the reviewing court 'can have no practical impact or provide the parties effectual relief. [Citation.]' [Citation.] 'When no effective relief can be granted, an appeal is moot and will be dismissed.' [Citation.]" (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 214.)

There is an exception to the mootness rule, however, when an issue is of general public interest and likely to recur, i.e., the issue is " 'capable of repetition yet evading review.' " (*Bracher v. Superior Court* (2012) 205 Cal.App.4th 1445, 1455.) The People argue that the issue here does not come within the exception, pointing to *People v. Lindsey* (1971) 20 Cal.App.3d 742. *Lindsey* involved a determination that a criminal defendant was legally insane; he had been committed to a state hospital as incompetent to stand trial. While the appeal was pending, the hospital certified that the defendant had become sane. His case was restored to the trial calendar. The appellate court found that the appeal was moot and should be dismissed, because "the superintendent's certification of sanity terminates the commitment, leaving no prejudicial consequences which could be ameliorated by a successful appeal." (*Id*. at p. 744.) The People urge that, by parity of

---

**1** We granted the People's request to take judicial notice of the abstract of judgment below, showing that defendant has been sentenced on the underlying charge. The People renew their contention that the sentence renders the issue moot. We disagree; the public interest exception continues to apply. To dismiss for mootness in cases such as this would allow the state to commit serious violations of fundamental rights with impunity. It is to reach precisely such injustices that the public interest exception exists.

6

reasoning, defendant's restoration to competency here resulted in the termination of his commitment and the order for forced administration of medications, likewise "leaving no prejudicial consequences [that] could be ameliorated by a successful appeal." (*Id.* at p. 744.)

The order for involuntary administration of medications is, however, a different issue from a determination of sanity or competency to stand trial. A determination of incompetency does not necessarily involve involuntary administration of medications. A defendant suffering from mental illness may nevertheless have the capacity to make decisions about medical treatment, even if he or she is incompetent to stand trial. The order for involuntary administration of medications invades an important interest of personal autonomy and liberty, quite apart from the issue of competency alone. A defendant's restoration to competency may be dependent upon continued administration of medications, such that the issue is likely to arise repeatedly, in a manner inapplicable to a defendant who has the capacity to make medical decisions for himself or herself.

The People contend that defendant might have secured more timely review of the issue if he had proceeded by way of a writ, rather than filing an appeal. (See *Carter v. Superior Court* (2006) 141 Cal.App.4th 992, 998-999.) Even in *Carter*, however, the petition was rendered technically moot by other proceedings (dismissal of the information pursuant to Pen. Code, § 995), and the court invoked the public interest exception to the mootness doctrine. Using a writ proceeding will not necessarily obviate or avoid mootness. In addition, as the People also acknowledge, an order authorizing

involuntary administration of medication may properly be reviewed on direct appeal. (See *People v. Christiana* (2010) 190 Cal.App.4th 1040, 1046-1047 [119 Cal.Rptr.3d 191] (*Christiana*); see also *People v. Coleman* (2012) 208 Cal.App.4th 627, 632.) "Section 1086 of the Code of Civil Procedure provides that the writ of mandate 'must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law.' " (*Phelan v. Superior Court* (1950) 35 Cal.2d 363, 366.) Conversely, "[a]lthough the statute does not expressly forbid the issuance of the writ if another adequate remedy exists, it has long been established as a general rule that the writ will not be issued if another such remedy was available to the petitioner. (*Irvine v. Gibson* [(1941)] 19 Cal.2d 14 [118 P.2d 812]; *People v. Olds* (1853), 3 Cal. 167 [58 Am.Dec. 395].)" (*Ibid.*)

We conclude that defendant was not required to file a writ petition; proceeding by appeal was appropriate. We also find it appropriate to apply the public interest exception to the mootness doctrine, inasmuch as the issue involves very important liberty interests, and arises in a context in which the same issue is likely to arise again, yet evade timely review.

We turn next to the merits.

II. The Evidence Was Insufficient to Support the Order for Involuntary Administration of Antipsychotic Medications

In *Christiana, supra*, 190 Cal.App.4th 1040 this court explained the relevant criteria to be considered: "The United States Supreme Court has held that 'an individual

8

has a "significant" constitutionally protected "liberty interest" in "avoiding the unwanted administration of antipsychotic drugs." [Citation.]' [Citation.] To override that interest for the purpose of restoring a criminal defendant to competency to stand trial, due process requires the trial court to determine four factors: 'First, a court must find that important governmental interests are at stake.' [Citation.] 'Second, the court must conclude that involuntary medication will significantly further those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense . . . . [Citation.]' [Citation.] 'Third, the court must conclude that involuntary medication is necessary to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. . . .' [Citation.] 'Fourth, . . . the court must conclude that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition.' " (*Christiana, supra,* 190 Cal.App.4th 1040, 1049, fn. omitted, italics omitted, quoting *Sell v. United States* (2003) 539 U.S. 166, 178, 180–181 [156 L.Ed.2d 197, 123 S.Ct. 2174] (*Sell*).)

"[Penal Code s]ection 1370, which authorizes involuntary treatment in California, 'essentially tracks the *Sell* factors. (§ 1370, subd. (a)(2)(B[(i)(III))]; [citation].) Under section 1370, . . . the trial court may authorize "the treatment facility to involuntarily administer antipsychotic medication to the defendant when and as prescribed by the

defendant's treating psychiatrist," if the court determines that "[t]he people have charged the defendant with a serious crime against the person or property; involuntary administration of antipsychotic medication is substantially likely to render the defendant competent to stand trial; the medication is unlikely to have side effects that interfere with the defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner; less intrusive treatments are unlikely to have substantially the same results; and antipsychotic medication is in the patient's best medical interest in light of his or her medical condition." ([Pen. Code,] § 1370, subd. (a)(2)(B)[(ii), (i)(III)].)' (*Christiana*, *supra*, 190 Cal.App.4th at pp. 1049–1050.) We review an order authorizing involuntary treatment under section 1370 for substantial evidence. (*Christiana*, pp. 1049–1050.)" (*People v. Coleman, supra,* 208 Cal.App.4th 627, 633.)

Defendant contends that the evidence was insufficient to support findings that the relevant criteria were met to impose an order for involuntary medication with antipsychotic drugs.

Penal Code section 1370, subdivision (a)(2)(B), provides in relevant part:

"(B) The court shall hear and determine whether the defendant lacks capacity to make decisions regarding the administration of antipsychotic medication, and shall proceed as follows:

"(i) The court shall hear and determine whether any of the following is true:

10

"(I) The defendant lacks capacity to make decisions regarding antipsychotic medication, the defendant's mental disorder requires medical treatment with antipsychotic medication, and, if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the patient will result. Probability of serious harm to the physical or mental health of the defendant requires evidence that the defendant is presently suffering adverse effects to his or her physical or mental health, or the defendant has previously suffered these effects as a result of a mental disorder and his or her condition is substantially deteriorating. The fact that a defendant has a diagnosis of a mental disorder does not alone establish probability of serious harm to the physical or mental health of the defendant.

"(II) The defendant is a danger to others, in that the defendant has inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another while in custody, or the defendant had inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm on another that resulted in his or her being taken into custody, and the defendant presents, as a result of mental disorder or mental defect, a demonstrated danger of inflicting substantial physical harm on others. Demonstrated danger may be based on an assessment of the defendant's present mental condition, including a consideration of past behavior of the defendant within six years prior to the time the defendant last attempted to inflict, inflicted, or threatened to inflict substantial physical harm on another, and other relevant evidence.

"(III) The people have charged the defendant with a serious crime against the person or property, involuntary administration of antipsychotic medication is substantially likely to render the defendant competent to stand trial, the medication is unlikely to have side effects that interfere with the defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner, less intrusive treatments are unlikely to have substantially the same results, and antipsychotic medication is in the patient's best medical interest in light of his or her medical condition.

"(ii) If the court finds any of the conditions described in clause (i) to be true, the court shall issue an order authorizing the treatment facility to involuntarily administer antipsychotic medication to the defendant when and as prescribed by the defendant's treating psychiatrist. The court shall not order involuntary administration of psychotropic medication under subclause (III) of clause (i) unless the court has first found that the defendant does not meet the criteria for involuntary administration of psychotropic medication under subclause (I) of clause (i) and does not meet the criteria under subclause (II) of clause (i)."

Here, the trial court found that defendant qualified for involuntary administration of antipsychotic drugs under clauses (a)(2)(B)(i)(I) and (a)(2)(B)(i)(II) of Penal Code section 1370. Defendant argues that the evidence was insufficient to support the findings under those two clauses.

A.  The Evidence Under Clause (a)(2)(B)(i)(I) of Penal Code Section 1370

To support an order under clause (a)(2)(B)(i)(I) of Penal Code section 1370, the court was required make three findings:  (1) that defendant lacked capacity to make decisions regarding antipsychotic medication; (2) that his mental disorder required treatment with antipsychotic medication; and (3) that serious harm to defendant's physical or mental health would result if he were not treated.

Defendant urges that the necessary findings were not supported by the evidence.

**1.  The Evidence Was Insufficient to Show That Defendant Lacked the Capacity to Make Medication Decisions**

As to defendant's capacity to make medical decisions, Dr. Oshrin testified both that defendant lacked such capacity, and that he did have the capacity to make medical decisions.  Dr. Oshrin's opinion that defendant lacked the capacity to make medical decisions was based on defendant's mental confusion and disorganization, "to the point that his judgment and insight . . . are poor."  Dr. Oshrin diagnosed defendant as suffering from substance-induced psychotic disorder, based on defendant's history of taking drugs and his demeanor when Dr. Oshrin interviewed him.

Dr. Oshrin also testified that it was possible that defendant suffered from a different disorder; in the case of some other possible diagnoses, antipsychotic medication might not be an appropriate treatment.  As to the diagnosis of substance-induced psychotic disorder, the first method of treatment is to abstain from intoxicating substances.  It was possible for a patient with a substance-induced psychotic disorder to

13

recover, without antipsychotic medication, if the patient refrained from using illicit substances. As of the time of the hearing, September 16, 2013, over one month after Dr. Oshrin had examined defendant, Dr. Oshrin had no knowledge whether defendant's condition had improved or worsened in that interval.

Dr. Oshrin conceded, and the evidence was uncontroverted, that defendant recognized that he had a mental disorder of some kind, that he had taken medications for it in the past, and that he had never refused to take his prescribed medications. He had even at times asked for medication from the jail physician. Inasmuch as defendant had made the decision in the past to take his medications, and because he stated he was willing to continue to take prescribed medications, Dr. Oshrin stated that, "At the moment," defendant was capable of making medication decisions. Dr. Oshrin testified that defendant lacked a " 'deep understanding of his mental illness,' " but he conceded that a person could have the capacity to make medication decisions without a deep understanding of his or her mental illness. Dr. Oshrin also stated that it was likely that defendant's condition would improve if he did not have access to the substances that induced his psychosis.

Later, on redirect examination, Dr. Oshrin indicated that defendant's understanding of his condition and his decision-making ability was " 'superficial.' " He explained that patients could be compliant, would perhaps take the word of an authority figure that medications were needed, and could cooperate in taking what was given them, "without any real understanding." In defendant's case, defendant was "willing to go

14

along with the program," and would be "willing to take medication if the professionals feel he needs it," but Dr. Oshrin believed that defendant was "not able to form [an] opinion himself" as to whether he would need or want medication.

Defendant contends that, on this state of the record, the evidence was insufficient to support a finding that he lacked the capacity to make medication decisions. Defendant was aware that he had mental health issues, and during some of his examinations, he was aware of what medications he had been prescribed to treat those conditions. He had directly expressed his willingness to take medications, if they helped him. Defendant had at times initiated requests for medication. Defendant had also participated in changes in his medication, based on his reports of side effects. Even without a " 'deep understanding' " of his medical condition, defendant had essentially already been making ongoing medication decisions for himself for some time before Dr. Oshrin's evaluation.

To the extent that Dr. Oshrin opined that defendant lacked the capacity to make medication decisions for himself, that opinion was contradicted both by defendant's actual functioning and by Dr. Oshrin's own testimony. Dr. Oshrin's opinion that defendant could not make medication decisions himself was based on the notion that defendant did not have a "deep understanding" of his medical condition. Dr. Oshrin himself undermined the foundation of that opinion when he conceded that a "deep understanding" was not required to be competent to make medication decisions. The court was not presented with two opinions, each equally supported by the evidence. Rather, Dr. Oshrin's conclusion—that defendant was not competent to make medication

15

decisions himself—was negated by his concession that the basis for the conclusion was unsound.

**2. The Evidence Was Insufficient to Show That Defendant Required Antipsychotic Medication to Treat His Condition**

Dr. Oshrin did agree with the prosecutor, in conclusional terms, that defendant "probably would worsen" if he were not treated with antipsychotic medications. Dr. Oshrin opined that defendant required treatment with antipsychotic medications based on defendant's "mental confusion and disorganization. Antipsychotic medication is designed to improve that process, to make him more rational and logical."

Dr. Oshrin admitted on cross-examination, however, that when a patient suffers from substance-induced psychosis, the first line of treatment is to refrain from using intoxicating substances. Once again, the court was not presented with a choice of two medical opinions, each equally supported by the evidence. One of Dr. Oshrin's opinions—that defendant's condition would worsen if he were not medicated—was inherently inconsistent with the principle that a person with drug-induced psychosis would fully recover without any additional medication, as long as illicit intoxicants were withdrawn. Dr. Oshrin demonstrated that his conclusion was not supported by the premises of his argument.

Dr. Oshrin also agreed that a patient with that particular diagnosis could recover, without medication, simply by refraining from the use of illicit substances. Dr. Oshrin insisted that, "[n]o matter what the person's medical condition is[,] there is some

16

antipsychotic medication which can be used with minimal damage to their medical condition." Dr. Oshrin's opinion amounted essentially to an endorsement that antipsychotic medication is always beneficial for a mental health patient. However, that is not the same thing as saying that antipsychotic medication was *required* to treat defendant's condition. The proposition that psychotropic medications are generally beneficial in the treatment of persons with mental disorders is not a proper basis upon which to deprive a patient of the fundamental liberty interest in making medication decisions for himself or herself. Such a general proposition does not satisfy the strict requirement that the necessity of medication be proven before the patient's liberty interest may be circumscribed.

**3. The Evidence Was Insufficient to Show That, Without Antipsychotic Medication, Serious Harm to Defendant's Mental or Physical Health Would Result**

As just recounted, Dr. Oshrin testified both that defendant "probably would worsen" without antipsychotic medication, and that defendant could possibly recover, given his diagnosis of substance-induced psychosis, simply by refraining from using intoxicating substances, without being treated with antipsychotic medication. Defense counsel asked Dr. Oshrin, "you don't know whether or not [defendant's substance-induced psychotic disorder] will get worse without antipsychotic medications, do you?" Dr. Oshrin responded, "Oh, I doubt if it would get worse. As I testified before, the likelihood is it would get better without access to these substances."

As before, Dr. Oshrin undercut his own opinion; the opinion or conclusion that defendant would suffer serious harm if he were not medicated was without basis or support, given his concession that defendant might well recover, even without administering any psychotropic medications.

**4. Conclusion: The Evidence Was Insufficient to Support an Order for Involuntary Medication Under Penal Code Section 1370, Subdivision (a)(2)(B)(i)(I)**

As appellate defense counsel points out, there were many areas of deficiency in Dr. Oshrin's opinion testimony. Dr. Oshrin had not taken a thorough medical history of defendant, even though such a history would be required for a physician to determine whether and which antipsychotic medications would be indicated for defendant's condition. Without a proper history, e.g., whether the patient also had a seizure disorder or other conditions, it would be difficult to determine whether any particular medication would have deleterious effects on the additional medical conditions, or whether the effectiveness of the drug would be obviated by the additional conditions. Dr. Oshrin arrived at a diagnosis in defendant's case, but characterized it as an "educated guess," acknowledging that several of the other examining doctors had arrived at different diagnoses and that other diagnoses were possible.

In short, Dr. Oshrin was not aware of all of defendant's medical history, he was unsure of the diagnosis, and he testified as to no drug in particular, so that he could not be reasonably sure of the necessity or effectiveness of any particular drug. (See *People v. O'Dell* (2005) 126 Cal.App.4th 562, 571 [determination of whether antipsychotic

18

medication would positively or negatively affect the patient's mental disorder required consideration of particular medications. Failure to specify any particular drug made it impossible to evaluate whether involuntary treatment was required].) In addition, Dr. Oshrin's testimony indicated that defendant understood that he had a mental illness, that defendant understood that his condition improved when he took his medication, and that defendant's condition could likely improve, even without the intervention of antipsychotic medications. "Like a house built on sand, the expert's opinion is no better than the facts on which it is based." (*Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 923; accord, *Griffith v. County of Los Angeles* (1968) 267 Cal.App.2d 837, 847 [an expert's opinion cannot constitute substantial evidence if unsubstantiated by facts].) Here, Dr. Oshrin's opinions reflected mere conclusions, without the necessary facts to support them, and indeed he negated the predicates of his conclusions with his own testimony.

The evidence was insufficient to demonstrate that defendant could not make medication decisions, that any medication was necessary, or that defendant's health would suffer if he did not take antipsychotic medications.

B. The Evidence Under Clause (a)(2)(B)(i)(II) of Penal Code Section 1370

An order for involuntary treatment under Penal Code section 1370, subdivision (a)(2)(B)(i)(II), requires the court to find that a defendant has inflicted, attempted to inflict, or made a serious threat to inflict substantial physical harm on another person, either while in custody, or that resulted in his or her being taken into

19

custody. It also requires a finding that the defendant presents, as a result of mental disorder or mental defect, a demonstrated danger of inflicting substantial physical harm on others. "Demonstrated danger" may be based on an assessment of the defendant's present mental condition, including a consideration of the defendant's behavior within the past six years.

**1. The Evidence Was Insufficient to Support a Finding That Defendant Was a Danger to Others Under the Statute**

Dr. Oshrin testified that defendant was a danger to others as a result of his mental disorder. Dr. Oshrin based his opinion in part on the current charges, which he characterized as an assault on two officers (see Pen. Code, § 69, resisting executive officers). Although Dr. Oshrin did not have the police report or arrest report, he did have access to the felony complaint in the instant matter.

The complaint alleged, in the terms of the statute, that defendant "did willfully and unlawfully attempt by means of threats and violence to deter and prevent [the two officers] . . . from performing a duty imposed upon such officer by law, and did knowingly resist [the officers] by the use of force and violence . . . ."

The complaint also alleged that defendant had been convicted in 2011 of a felony count of aggravated battery by gassing (Pen. Code, § 4501.1); "gassing" is defined as placing or throwing excrement or other bodily fluids or substances on the person of any peace officer. That offense took place within six years before the instant resisting arrest charges.

20

There was also a notation in Dr. Oshrin's report that, according to administrative records, defendant had to be placed in a safety cell when he was taken into custody, because he had been banging his head on the door and kicking the door.

As defendant points out, however, an order for involuntary medication under Penal Code section 1370, subdivision (a)(2)(B)(i)(II), requires a showing of dangerousness to others, consisting of infliction of, attempt to inflict, or threat to inflict *substantial* bodily harm on another.

Defendant urges that the complaint alone is devoid of any facts to show that defendant inflicted, attempted to inflict, or threatened to inflict substantial physical harm on the officers. The allegations are framed in terms of the statutory language, but there is no description of the events that took place, which caused the officers to arrest defendant. It is possible to resist executive officers without creating a risk of substantial physical harm to the officers. Only sufficient force as to constitute resistance is required, and such force need not be directed to any officer. (*People v. Bernal* (2012) 222 Cal.App.4th 512, 517 [Pen. Code, § 69 sets forth two ways to commit the offense: use of threats or violence to deter an officer in the performance of duty, or knowingly resisting, by force or violence, an officer in the performance of duty. As to the second type of violation, "[o]ther than forceful resistance, the terms of the statute do not require that a defendant use any other manner of force or violence on the person of the executive officer." A violation "need not involve any force or violence directed toward the person of an executive officer. Rather, . . . force used by a defendant *in resisting* an officer's attempt

21

to restrain and arrest the defendant is sufficient to support a conviction." (*Bernal* at p. 519.)].)

Likewise, the conviction of assault by gassing does not describe defendant's conduct, so as to demonstrate facts constituting actual infliction of, attempt to inflict, or threat to inflict substantial physical harm on any officer. Defendant's other convictions were not within six years before the current charge.

As to defendant's being placed in a safe cell on his arrest, that conduct evidently involved self-harm, banging his head on the door of his cell and kicking the door, rather than manifesting dangerousness to others.

**2. Conclusion: The Evidence Was Insufficient to Support an Order for Involuntary Medication Under Penal Code Section 1370, Subdivision (a)(2)(B)(i)(II)**

Dr. Oshrin was not possessed of any facts to support his opinion that defendant had manifested dangerousness to others, consisting of infliction of, attempt to inflict, or threat to inflict substantial physical harm on others while in custody or which necessitated his being taken into custody. The evidence was insufficient to support the trial court's order for involuntary administration of medications, based on Penal Code section 1370, subdivision (a)(2)(B)(i)(II).

C. <u>The Evidence Under Clause (a)(2)(B)(i)(III) of Penal Code Section 1370</u>

The trial court did not purport to make a finding under Penal Code section 1370, subdivision (a)(2)(B)(i)(III), to support its order for involuntary administration of antipsychotic medications.

22

Penal Code section 1370, subdivision (a)(2)(B)(i)(III), requires five findings to support an order for involuntary administration of antipsychotic medications: (1) the defendant is charged with a serious crime against the person or property; (2) involuntary administration of antipsychotic medication is substantially likely to render the defendant competent to stand trial; (3) the medication is unlikely to have side effects that interfere with the defendant's competence; (4) less intrusive treatments are unlikely to have substantially the same results; and (5) antipsychotic medication is in the patient's best medical interest.

The court may not base an order on Penal Code section 1370, subdivision (a)(2)(B)(i)(III), unless the court has first found the other two clauses inapplicable. The trial court here never made such a finding of inapplicability, and did not purport to make the order for involuntary administration of antipsychotic medications in reliance on subdivision (a)(2)(B)(i)(III). The People concede that the trial court "did not find that forcible medication was necessary to render [defendant] competent to stand trial under Penal Code section 1370, [subdivision] (a)(2)(B)(i)(III), or *Sell v. United States*, *supra* [539 U.S. 166, [156 L.Ed.2d 197, 123 S.Ct. 2174]]. . . . Because the trial court did not find, and was not required to find that medication was required under subdivision (a)(2)(B)(i)(III), [the People do] not suggest that involuntary medication was warranted under this provision."

Accordingly, we do not address the requirements of a finding under Penal Code section 1370, subdivision (a)(2)(B)(i)(III).

## DISPOSITION

" 'The importance of the defendant's liberty interest, the powerful and permanent effects of anti-psychotic medications, and the strong possibility that a defendant's trial will be adversely affected by the drug's side-effects all counsel in favor of ensuring that an involuntary medication order is issued only after both sides have had a fair opportunity to present their case and develop a complete and reliable record.' [Citation.]" (*Carter v. Superior Court*, *supra*, 141 Cal.App.4th 992, 1005.) That standard was not met in this case. We agree with defendant that the evidence was insufficient to support the order for involuntary administration of antipsychotic medications under Penal Code section 1370, subdivisions (a)(2)(B)(i)(I) and (a)(2)(B)(i)(II). Any order for involuntary administration of antipsychotic medications should be based only upon competent factual evidence. The order authorizing involuntary administration of antipsychotic medications is reversed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____
J.

We concur:


RAMIREZ_____
P. J.


RICHLI_____
J.


24