Filed 8/14/15  P. v. Henslee CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRANDON NOBLE HENSLEE,<br><br>    Defendant and Appellant. | 2d Crim. No. B252553<br>(Super. Ct. No. F480212)<br>(San Luis Obispo County)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed July 16, 2015, be modified as follows:

On page 1, line 6, the phrase ", if necessary," is deleted.

On page 8, last line, and page 9, first line, delete "Similarly irrelevant is" and replace it with "Nor can we infer incompetence from".

[There is no change in the judgment.]

Appellant's petition for rehearing is denied.

Filed 7/16/15  P. v. Henslee CA2/6 (unmodified opinion)
## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRANDON NOBLE HENSLEE,<br><br>    Defendant and Appellant. | 2d Crim. No. B252553<br>(Super. Ct. No. F480212)<br>(San Luis Obispo County) |

   Appellant was charged with the murder of his half brother.  (Pen. Code, § 187, subd. (a).)[1]  A month after the complaint was filed, his attorney declared a doubt that he was competent to stand trial.  (§ 1368, subd. (b).)  Proceedings were suspended (§ 1368, subd. (c)), and two psychologists were appointed to examine him.  Each found him incompetent to stand trial.  The trial court committed him to Atascadero State Hospital for treatment.  (§ 1370, subd. (a)(1)(B)(i).)  It ordered that, if necessary, he be treated involuntarily with antipsychotic medication to assist him in regaining his competency.  (*Id.* at subd. (a)(2)(B)(ii).)

   Within three months it was determined that appellant's competence had been restored, and he was returned to court.  (§§ 1370, subd. (b)(1), 1372.)  He entered into a plea agreement under which he would plead no contest to second degree murder

_____

  **1** All further statutory references are to the Penal Code unless otherwise stated.

and admit that he personally used a deadly weapon (§ 12022, subd. (b)(1)). After discussing the consequences of the plea change with the trial court, appellant decided to stand trial. Ultimately he was tried and convicted by a jury of first degree murder. The jury found the weapon use allegation to be true, and the trial court found a prior prison term allegation (§ 667.5, subd. (b)) to be true. Appellant was sentenced to 27 years to life in state prison. There was no objection to the procedures used for appellant's commitment and treatment at Atascadero, the finding that his competency had been restored, or the procedures followed through the conclusion of trial.

Appellant contends that the trial court violated his due process rights under both the state and federal Constitutions in ordering that he be involuntarily given psychotropic medication and by failing to hold a second competency hearing following commencement of trial when it became apparent that his mental state had substantially deteriorated. We affirm.

FACTS

Appellant and victim Tyler Hanks were half brothers. One evening, Hanks jokingly told appellant he was fat and called him a "fag." Appellant stated, "I am going to whack him." He repeated this statement four or five times. Early the next morning, Hanks was bludgeoned with a baseball bat and stabbed 20 times in the head with a screwdriver. He died. Around 4:30 a.m., a guest staying in the garage, Steven Smith, heard a loud ruckus of trash cans being jumbled around in front of the house and saw appellant wheeling a green waste can towards the backyard. When Smith asked appellant what he was doing, appellant told him, "this doesn't concern you." Appellant told Smith that the backyard was "off limits." Around the same time, appellant mopped the living room floor even though he usually did not clean the house.

The next day, the green waste can was no longer in the backyard. When appellant's mother's husband, Michael Coffin, asked him where it was, appellant told him, "No worries. I will get it back." The following evening, several neighbors heard a heavy trash can being moved towards and later away from a nearby preserve. It was several days before the garbage was scheduled to be picked up. Around 11:30 p.m.,

2

Coffin and Smith discovered appellant in front of the house rinsing out the green waste can with a high-pressure hose. Coffin looked inside and saw one or two gallons of blood and water. One of Hanks' friends called 9-1-1 the next morning.

Sheriff's deputies followed tracks possibly created by the waste can through the Fiscalini Ranch Preserve. They found a trail of debris including a blood-stained tennis shoe, a shovel, clothing, a couch cushion, a towel, and a pool of blood with various items of trash. At the end of the trail, Hanks' body was buried under a pile of pine needles. It was covered in blood and a screwdriver was imbedded in the base of the skull. The blood inside the waste can, on the baseball bat and screwdriver, and splattered throughout the living room area matched Hanks' DNA profile. DNA matching appellant's profile was recovered from the baseball bat grip. At the time of appellant's arrest, he had a puncture wound on his right palm consistent with the screwdriver used to kill Hanks.

## DISCUSSION

### *Involuntary Medication Order*

Subject to certain limitations, a pretrial detainee has a right under both the state and federal Constitutions to refuse antipsychotic drugs. (*Sell v. United States* (2003) 539 U.S. 166, 177-179; *In re Qawi* (2004) 32 Cal.4th 1, 14-15.) In order to administer such drugs against the defendant's wishes, the trial court must find that (1) an important governmental interest, such as the prosecution of a serious crime against a person or property, is at stake; (2) involuntary medication is substantially likely to render the defendant competent to stand trial and is unlikely to have side effects that will significantly interfere with the defendant's ability to assist counsel in conducting a defense; (3) less intrusive treatments are unlikely to produce substantially the same results; and (4) administration of the drugs is in the defendant's best medical interest in light of his or her medical condition. (*Sell*, *supra*, at pp. 179-181; accord, § 1370, subd. (a)(2)(B)(i)(III).) We review a trial court's order authorizing involuntary medication for substantial evidence. (*People v. Coleman* (2012) 208 Cal.App.4th 627, 633.)

3

Appellant contends that the trial court, and the two expert opinions upon which it relied, merely parroted the required findings in a conclusory manner and failed to offer any evidence to support them. Respondent argues that this claim is moot because the trial court's order provided for involuntary medication only at Atascadero—at which time the proceedings against appellant were suspended—and any antipsychotic medication he took during trial was voluntary. Appellant disputes the factual basis for respondent's mootness argument, asserting that "the order . . . continued [to be] operative throughout his jury trial."

In its commitment order, the trial court found "that involuntary antipsychotic medication is necessary as a part of treatment to assist [appellant] in regaining competency and provide[d for the] authority of [the] state hospital to administer medications deemed appropriate." By its express terms, this order applied only to Atascadero staff. It had no legal effect at any time following the reinstatement of criminal proceedings against appellant and, because it was limited to one year, has long since expired. Consequently, any claim of error in the trial court's ruling is moot. (E.g., *People v. Wilkinson* (2010) 185 Cal.App.4th 543, 547.)

At oral argument, appellant's counsel asserted that the trial court's oral order, as reflected in the reporter's transcript, was not limited to any particular time or place. Yet no one administering psychotropic medication to appellant would have had a copy of the reporter's transcript. The trial court's written order, which was limited in scope to Atascadero, would have been followed.[2] Moreover, the trial court's oral order was necessarily limited by the relevant statute, which provides that after making the requisite factual findings, "the court shall issue an order authorizing involuntary administration of antipsychotic medication to the defendant . . . at any facility housing the defendant for purposes of [sections 1367-1376]." (§ 1370, subd. (a)(2)(B)(ii).) The purpose of these sections is for the assessment and, if necessary, restoration of a criminal

---

[2] Appellant's counsel dismissed the trial court's minute order as of January 7, 2013, as "a clerk limiting the trial court's order in the clerk's transcript." The order was signed by the trial judge.

4

defendant's mental competence to stand trial. Thus, an involuntary medication order extends only to the period of time in which a defendant is being treated as incompetent. That ended here when appellant left Atascadero.

Insofar as appellant claims that after he was discharged from Atascadero, county jail staff medicated him against his will despite lacking authorization, he "may not raise for the first time on appeal the claim that he was denied due process of law because drugs were administered to him to control his mental condition during the proceedings." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1361.) Moreover, the record contains no evidence to support such a claim. The trial court's statement to appellant that "I know that you are taking some medication" is consistent with appellant's claim, but it is equally consistent with appellant voluntarily taking his medication. So is the trial court's subsequent statement: "I did ask custodial staff to contact the jail to determine whether there has been any change in his medication or his compliance with his medication. I am advised he has been taking his medication, as has been previously prescribed, and there has not been any change or modification in that medication regimen." If anything, the trial court's need to verify with jail staff that appellant was taking his medication suggests that he was not under any compulsion to do so. The trial court had no "sua sponte [duty] to determine whether or not he was receiving medication voluntarily, and whether or not that medication had exposed [him] to side effects." (*Ibid*.)

Appellant has taken various antipsychotic medications since he was six or seven years old. In a telephone conversation while he was in jail three months before trial, his grandmother pleaded with him to take his medication. He promised her he would. This is substantial evidence that appellant was taking the medication voluntarily, and we reject his unsupported claim to the contrary. "[B]ecause this case does not involve an effort to forcibly medicate [appellant], the *Sell* findings were not required." (*People v. Dunkle* (2005) 36 Cal.4th 861, 892, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

5

*Need for Second Competency Hearing*

Appellant contends that the trial court erred by failing to order a second competency hearing based on his irrational behavior at trial inasmuch as the trial of an incompetent defendant violates both federal and state due process. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1281.)

A defendant is presumed competent to stand trial. (§ 1369, subd. (f).) This presumption can be rebutted upon a showing by a preponderance of the evidence that, "as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§§ 1367, 1369, subd. (f).) Once a criminal defendant has been restored to competency, a trial court is obligated to reinitiate proceedings to determine his competency only if he presents "'. . . ". . . a substantial change of circumstances or . . . new evidence"' that gives rise to a 'serious doubt' about the validity of the competency finding." (*People v. Marshall* (1997) 15 Cal.4th 1, 33; *People v. Murrell* (1987) 196 Cal.App.3d 822, 827.) When the defendant's competency is not challenged a second time and the trial court does not declare a doubt about it sua sponte, we afford great deference to the trial court and will uphold the judgment absent substantial evidence in the record demonstrating the defendant was incompetent to stand trial. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 465, 467.)

Here, appellant was released from Atascadero because the staff doctors concluded that he was competent to stand trial. He "reviewed the details of the police report with his treatment team and although he [did] not agree with all the details . . . , he [was] aware of the possible evidence in the case against him." He knew that he was charged with murder and, if convicted, could receive a sentence of life in prison or death. He understood the rudiments of criminal procedure, including the various pleas available. His treatment team concluded that he had "the capacity to communicate and provide his attorney with relevant details about his case" and "to work with his attorney and discuss legal options in a logical and rational manner." Both the prosecution and defense counsel

6

submitted the issue of appellant's competence on the basis of the Atascadero report, and the trial court found appellant had regained competency.

At no time after appellant's return from Atascadero did defense counsel seek a second competency determination. Although not determinative, this "is significant because trial counsel interacts with the defendant on a daily basis and is in the best position to evaluate whether the defendant is able to participate meaningfully in the proceedings [citation]." (*People v. Rogers* (2006) 39 Cal.4th 826, 848.) It is especially significant here where, on the second day of trial, defense counsel affirmatively represented to the trial court that appellant had the mental capacity to enter into a guilty plea and "appear[ed] to understand the nature of the conversations [with counsel] and anticipate where those conversations [were] going." At the *Marsden* hearing just prior to sentencing, defense counsel told the court that he and appellant had "had lengthy conversations about whether or not he should testify, and . . . were both in agreement that it would not be in his best interests."[3] This evidence suggests that appellant was able to assist counsel in his defense in a rational manner. Nothing in the record is to the contrary.

Appellant points to various statements made before, during, and after trial. We agree with respondent that most of these statements merely amount to " 'a litany of facts, none of which actually related to his competence . . . to understand the nature of th[e] proceeding[s] . . . .'" (*People v. Ramos* (2004) 34 Cal.4th 494, 508.) Such evidence is "inadequate to support holding a competency hearing." (*Ibid.*)

In many of the statements, appellant was simply trying to convince family members of his innocence by concocting an alternative narrative: that Hanks began vomiting in the living room; that appellant brought him the waste can and Hanks vomited into it; that Hanks had an ulcer, which would have accounted for the blood; that Hanks ultimately left for the preserve where his body was recovered to give bedding to a "bum" for a toga party; and that the bum killed him. While this explanation is far-fetched and

---

[3] (*People v. Marsden* (1970) 2 Cal.3d 118.)

7

appellant's counsel understandably chose not to pursue it as a defense, appellant's statements make clear that he had a rational understanding of his situation. He understood the key evidence against him and was attempting to create a story that was consistent with both the evidence and his innocence.

Appellant fully appreciated the problems that blood evidence presented to his defense. After killing Hanks, he mopped the living room floor with bleach and hid the sofa cushion to get rid of the evidence of blood. During a post-arrest interrogation, when the police left him alone in the room, he noticed blood on his jeans and tried to rub it out with saliva. After it became clear to him that he had not eliminated all of the blood from the living room, he made up the story that Hanks had an ulcer to explain the remaining traces.

The other statements appellant flags are no more indicative of incompetency. At the change-of-plea hearing when appellant said, "I don't believe there is any witnesses that . . . have any information involving the case," it is clear from context that he meant there were no "witnesses that actually [had] seen [him] commit the . . . murder." That was true. The case against him was entirely circumstantial. Appellant recognized that there were witnesses who had relevant information. In concluding that "the odds are against me," he explained that "people are saying stuff that is not true and that is a lie." He nonetheless expressed his desire "to bring them to court" because he "would like them to testify." It was rational to think that he would be acquitted if the jury had reasonable doubts about the veracity of these witnesses even if such a strategy was unlikely to succeed.

That appellant asked his mother and grandmother to tell the judge and whisper to individual jurors that there was no evidence and that he was innocent reveals only his desperation. A motion to dismiss for lack of evidence is a possibility in some cases (§ 995) and his lack of awareness of the prohibition against ex parte communications with jurors is not a sign of incompetency. "The defendant's ' "technical legal knowledge" ' is irrelevant." (*People v. Blair* (2005) 36 Cal.4th 686, 711, rejected on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919-920.) Similarly irrelevant

8

is the jury's question about whether it could consider appellant's comments and behavior during trial and others' observations that he was sleeping at trial and talking, singing, and mumbling to himself, pacing, and displaying a "deteriorating . . . affect" in his cell. "More is required than just bizarre actions or statements by the defendant to raise a doubt of competency." (*People v. Marshall*, *supra*, 15 Cal.4th at p. 33.) The jury was properly instructed to ignore appellant's conduct.

The record lacks substantial evidence that appellant was incompetent at the time of trial. The trial court did not abuse its discretion by not holding a second competency hearing.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

9

Jacquelyn H. Duffy, Judge

Superior Court County of San Luis Obispo

_____


Dan Mrotek, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Allison H. Chung, Deputy Attorney General, for Plaintiff and Respondent.